James P. CLAYTON–EL, a/k/a
Carmichael Morrison,
Plaintiff–Appellant,

v.

Dwayne FISHER, Defendant–Appellee.

No. 92–1246.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1996.

Decided Sept. 12, 1996.

Karen K. Phillips (argued), Bollinger, Ruberry & Garvey, Chicago, IL, for Plaintiff–Appellant.

John A. Zimmerman, Office of the Atty. Gen., Brian F. Barov (argued), Office of the Atty. Gen., Crim. Appeals Div., Tanya Solov, Office of the Atty. Gen., Civ. Appeals Div., Chicago, IL, for Defendant–Appellee.

Before HARLINGTON WOOD, Jr., CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

While incarcerated in an Illinois prison, James Clayton–EL [1] had a fight with another prisoner. Prison officials conducted a disciplinary hearing and imposed sanctions for this conduct. The sanctions included the rescission of some of Clayton–EL's good-time credits, an action that could have affected the duration of his imprisonment. Believing that the sanctions were the result of a procedurally deficient hearing, Clayton–EL went to the district court seeking damages under 42 U.S.C. § 1983 for the procedural deficiency and its consequences. Because some of Clayton–EL's claims for damages implicated issues cognizable in habeas corpus, the district court stayed its consideration of the damages claims while Clayton–EL exhausted his state-court remedies. The state proceedings resulted in a new disciplinary hearing, which reached the same result as the first. This eventuality led the district court to conclude that prison officials had properly disciplined Clayton–EL and that he was therefore not entitled to any damages, regardless of whether the procedures at his first hearing were as deficient as he alleged. It issued a summary judgment for the defendant, and Clayton–EL appeals. This appeal turns on the complex problems that arise at the intersection of § 1983 and habeas corpus law. These complexities have led to slow, convoluted proceedings in this case; Clayton–EL's

---

1. As we shall illustrate, this case has an exceptionally tangled history—so tangled that not even the proper spelling of the appellant's name is undisputed. When the events leading to this case began, his name was Carmichael Morrison. Since then he has changed it, and the clerk of this court, appellee's counsel and appellant's court appointed counsel all spell his new surname as "Clayton–El." In our review of the record, we have read numerous *pro se* submissions in which he spells his surname both as "Clayton EL" and "Clayton–EL." Because this last spelling appears more frequently, we have chosen to use it.

fight and the alleged constitutional violation occurred more than ten years ago, and its legal consequences are still not clear. We reverse the judgment of the district court and remand the case for further proceedings, but we hope that this opinion will insure that the continuation of this case will not last long or become even more complex.

### I.

On June 14, 1986, while they were both prisoners at the Pontiac Correctional Center, Clayton–EL and Yuba LaSumba fought. Clayton–EL describes the altercation as a "one-on-one" fistfight, but two prison guards had a different view. They asserted that Clayton–EL had held LaSumba down so that other prisoners could strike him. In accordance with state administrative regulations, prison officials convened a hearing at which the prison's Adjustment Committee would make factual findings about the fight and decide what disciplinary measures, if any, to impose. As an essential element of the prison disciplinary process, both state regulations and federal constitutional law required that Clayton–EL receive advance written notice of the hearing and the charges against him. Ill. Admin. Code tit. 20, § 504.80(b); *Wolff v. McDonnell*, 418 U.S. 539, 563, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974). Illinois prisons usually provide this notice by having a prison guard serve the prisoner with a form entitled "Inmate Disciplinary Report"—known informally as a "disciplinary ticket."

Clayton-EL claims that no guard ever served him with a disciplinary ticket. After his fight with LaSumba ended, he was taken to Pontiac's hospital and housed in its segregation unit. Within a few hours, a prison guard, Dwayne Fisher, was assigned to distribute disciplinary tickets to Clayton–EL and other prisoners who had been charged with unrelated violations. According to Clayton–EL, who relies on information from his fellow prisoners, Fisher arrived in the cell block where Clayton–EL was ordinarily housed and began calling Clayton–EL's name. Clayton–EL's cell-block neighbors tried to tell Fisher that Clayton–EL was then housed elsewhere, but Fisher apparent-

ly ignored them and placed the ticket between the bars of Clayton–EL's empty cell. One of Clayton–EL's fellow inmates retrieved the ticket and attempted to forward it, but it arrived too late to furnish proper notice of the hearing, which was scheduled for June 19, 1986. In an affidavit, Fisher denies this account. Although he has no memory of the specific events, he maintains that the face of the disciplinary ticket proves that Clayton–EL's story is incredible. The disciplinary ticket includes a line for the prisoner's signature, which acknowledges receipt of notice; if the prisoner refuses to sign, the guard who serves the notice can check off a box on the form indicating this refusal. Fisher points out that the box is checked on the disciplinary ticket in question here and that he signed the ticket in the space provided for his signature. He avers that, as an absolute rule, he would not check off the box and sign the ticket unless the inmate did, in fact, refuse to sign. From these documentary clues and his own habits, he deduces that he must have served Clayton–EL and that Clayton–EL must have refused to sign.

The hearing went forward. Clayton–EL was surprised by its timing and by the precise nature of the charges and evidence against him. His defense amounted to his own denial of the charges, unsupported by any other evidence. He claims that he would have called LaSumba as a witness if he had been given the opportunity to do so and that LaSumba would have confirmed his version of events (in this connection, the record before us contains an affidavit from LaSumba). With only the guards' testimony in the administrative record, the Adjustment Committee found that Clayton–EL had committed the infractions with which he was charged, and it decided that he should lose a year's worth of good-time credits, that he should be subjected to a reduction in grade and that he should spend a year in disciplinary segregation.

Believing that he had undergone an unfair process, Clayton–EL filed a lawsuit in the district court under § 1983, proceeding pro se. The nature of his claims is quite complicated and requires careful explication. In his amended complaint, filed on April 24,

1987, he claimed that, by not serving him with notice of the Adjustment Committee hearing, Fisher had violated his right to procedural due process under the Fourteenth Amendment. As relief for this injury, he sought punitive damages in the amount of $150,000 and compensatory damages for the mental and emotional suffering occasioned by Fisher's alleged conduct. He also claimed this injury to his due process rights proximately caused injuries to other constitutional rights. In his view, the procedural deficiencies at his hearing ineluctably led the hearing officers to impose undeserved disciplinary sanctions. Clayton–EL alleged that one of these sanctions, his confinement in disciplinary segregation, prevented him from collecting prison wages and from doing research in the prison law library for an entirely different *pro se* suit in which he sought collateral relief from the conviction that had originally led to his imprisonment. He thus characterized this confinement as cruel and unusual punishment, and he believed that it deprived him of his constitutional right to have access to the courts because it prevented him from properly pursuing his other lawsuits. He sought actual and compensatory damages for these injuries, and he asked for a declaratory judgment that his confinement in segregation was illegal. He did not ask for the restoration of his good-time credits or for a change in his grade.

In an order issued in July 1988, the district court identified an obstacle to the immediate adjudication of these claims—the fact that some of the injuries that Clayton–EL alleged occurred as the result of the disciplinary sanctions imposed by the Adjustment Committee. To make a finding about these injuries, the district court would have also had to make a finding about the fairness of the entire process before the Adjustment Committee. But the district court noted that a finding about the fairness of this process could have a preclusive effect in a lawsuit in which Clayton–EL sought restoration of his good-time credits, a proceeding that could affect the duration of his imprisonment. The district court therefore ordered Clayton–EL to pursue state court remedies for the restoration of his good-time credits, and it stayed its adjudication of all of the § 1983 claims until the state proceedings concluded. It made this ruling in reliance on *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), *Crump v. Lane*, 807 F.2d 1394, 1399–1402 (7th Cir.1986) and *Hanson v. Heckel*, 791 F.2d 93, 95 (7th Cir.1986).

In October 1989, the Circuit Court for Montgomery County, Illinois found that Fisher had violated Clayton–EL's right to receive notice of his disciplinary hearing, and it issued a writ of mandamus commanding prison officials to restore Clayton–EL's good-time credits or, in the alternative, to give him a new hearing before the Adjustment Committee. The officials at the Stateville Correctional Center, to which Clayton–EL had been transferred, chose the latter alternative, and scheduled a hearing for November 15, 1989.

Clayton-EL also had trouble with *this* hearing. A few days before it was to take place, he was stabbed by another prisoner and went to Stateville's hospital ward which is located in the same section of the prison as the disciplinary segregation unit. At the time appointed for the hearing, a guard, Lamar Hankins, came to the hospital ward to escort Clayton–EL to the Adjustment Committee, and ordered Clayton–EL to put on handcuffs. Hankins and Clayton–EL disagree about what happened next. Clayton–EL asserts that he merely asked a question about the necessity of handcuffs, a question inspired by his extensive knowledge of correctional regulations. Illinois administrative regulations provide that a prison guard may order a prisoner who is on disciplinary segregation *status* to wear handcuffs while being moved within the prison. Ill. Admin. Code tit. 20, § 501.110(a)(1). Clayton–EL says that he asked Hankins if handcuffs were necessary, given the fact that he was not on disciplinary segregation status, even though he was housed with other prisoners who were. Clayton–EL's concern arose from his fear that his recent assailants would renew their attacks as he passed through the prison without any means of self-defense. He also says that he asked Hankins to check with Hankins' supervisor about the answer to this question. Hankins offers a different description of Clayton–EL's response to his order to

"cuff up," asserting that Clayton–EL simply refused to obey it.

Clayton-EL and Hankins do not disagree about what followed their encounter in the hospital ward. Hankins left the ward and went to the members of the Adjustment Committee, telling them that Clayton–EL had refused to wear handcuffs. The members of the committee construed this refusal as a waiver of his right to appear before them, and they proceeded with the hearing on the basis of what was before them—the evidence and findings from the first hearing. Because it had nothing else to go on, the Adjustment Committee adopted the findings of the first hearing in their entirety and concluded that the punishments already imposed were justified.

With the conclusion of the second Adjustment Committee hearing, the district court resumed its consideration of Clayton–EL's claim.[2] Both parties moved for summary judgment, and the court entered a summary judgment for Fisher with respect to the claims against him in his official capacity. But the court withheld its ruling on any of Clayton–EL's claims for damages against Fisher in his individual capacity. Citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), it pointed out that it could not rule on any claims for compensation until it determined whether Clayton–EL had, in fact, suffered any injuries as a result of the first hearing. It also concluded that it could not make this determination until the parties provided it with further information

about the second hearing. The court indicated that, if that hearing showed that Clayton–EL had deserved the disciplinary sanctions imposed in 1986, Fisher would win. The parties complied with this order by submitting memoranda. In his memorandum, Fisher insisted that the outcome of the second hearing demonstrated that Clayton–EL suffered no compensable injuries from the first hearing and therefore was not entitled to any relief under § 1983. Clayton–EL responded by contending that the second hearing proved nothing because it too was conducted in violation of his right to due process when he had been improperly deprived of his right to appear. He submitted his own affidavit describing his encounter with Hankins and he attached copies of the relevant administrative regulations. Fisher then added evidence of his own, including Hankins' affidavit, which asserted that Clayton–EL had simply refused to wear handcuffs and that he told the Committee as much.

Drawing upon this evidence, the district court entered summary judgment for Fisher. It found that Clayton–EL had been required to wear handcuffs and that he had refused to do so. It therefore found that the Adjustment Committee had not erred in finding that he had waived his right to appear or in adopting the findings and conclusions of the first Adjustment Committee. Because it found that prison officials had properly exercised their discretion in imposing sanctions on Clayton–EL, the district court concluded that he had suffered no damages whatsoever

---

**2.** At this point, the district court's understanding of the nature of the case seems to have changed. Between the filing of the first complaint in 1986 and the issuance of the stay order, the district court had treated the case as though it involved only claims for relief under § 1983. After taking up the case again in 1990, it construed this claim as a request for damages under § 1983 and for the restoration of good-time credits through a writ of habeas corpus under 28 U.S.C. § 2254. This is apparently a mistaken construction because the record before us does not show that Clayton–EL ever amended his complaint after April 1987. As we have noted, that complaint requested monetary relief and a declaratory judgment that his confinement in disciplinary segregation was illegal. Moreover, because Fisher was the only defendant named in the amended complaint, it would not be possible for Clayton–EL to seek a writ of habeas corpus. Fisher is

merely a prison guard and the court could not issue an effective writ of habeas corpus to him.

The district court's misconstruction has affected the procedural posture of the case in this court. When Clayton–EL sought to appeal the summary judgment for Fisher, the district court believed that it could certify the appeal only by following the procedure mandated for habeas cases. The district court thus issued a certificate of probable cause according to 28 U.S.C. § 2253 as a predicate for our jurisdiction. Because Clayton–EL did not seek any habeas relief, this procedure was unnecessary. Our jurisdiction here comes from 28 U.S.C. § 1291; and an ordinary notice of appeal would have been enough to activate it. Nevertheless, the case has come before us as a petition for a writ of habeas corpus. It is not. It is simply an appeal from a summary judgment in a claim for damages and for declaratory relief under § 1983.

from the deficient first hearing and was entitled to no relief under § 1983. Clayton–EL filed a motion for reconsideration in which he reiterated his factual allegations about the second hearing, but the district court stood by its order. Clayton–EL then filed a paper styled as both a motion for reconsideration and a notice of appeal in which he again asserted his view of the facts. At this point, the district court seems to have decided that Clayton–EL might have actually raised a material factual dispute regarding the fairness of the second hearing; but it concluded that it could not revisit its summary judgment because Clayton–EL's notice of appeal had divested it of jurisdiction. After some further controversy about the timing of the notice of appeal, the district court concluded that the notice was timely, and our jurisdiction was established.

## II.

The parties' appellate arguments illustrate how confounding this case has been. The parties cannot even agree about what the district court actually did here or about what the fundamental issues in the case really are, much less about how the issues should be resolved. Fisher contends that Clayton–EL no longer has any claims against him whatsoever and that the summary judgment in his favor is consistent with this view. As far as he is concerned, any injury that he might have inflicted in 1986 was redressed by the writ of mandamus and by the provision of a second disciplinary hearing in 1989, whether or not that second hearing was constitutionally sufficient. Fisher seems to presume that Clayton–EL only seeks the vacation of his disciplinary sanctions and argues, in effect, that, if Clayton–EL wants this relief, he should be challenging the procedures at his second disciplinary hearing and suing Officer Hankins. For his part, Clayton–EL correctly insists that his suit involves only damage claims, and he maintains that the district court should not have entered summary judgment against him on any of these claims because there was a dispute of fact about the fairness of the second disciplinary hearing. In addition, he suggests that he would be entitled to a judgment on all of his claims

against Fisher if he could resolve this dispute about the second hearing in his own favor.

After a careful consideration of the record and the applicable law, we have concluded that these arguments do not completely address the dispositive issues in this case. The parties do touch indirectly on some of the crucial points in the case. Fisher is on to something when he suggests that Clayton–EL's suit against him involves some issues that should really be decided in a suit challenging the second disciplinary hearing, a suit that would not involve him at all. For his part, Clayton–EL properly reminds us that some of his claims for damages have been overlooked. But these points ultimately relate to issues that concern the way in which courts should deal with § 1983 claims that involve issues also cognizable in habeas corpus proceedings under § 2254. Each of these statutes provides prisoners with relief from unconstitutional action by state officials, but their scope and operation is different, although the differences can be subtle and difficult to discern.

The relationship between §§ 1983 and 2254 have been extensively discussed in numerous opinions of this court and of the Supreme Court. The fundamental principles that determine this relationship have been recently and usefully summarized in the Supreme Court's opinion in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Those principles have been specifically applied to contexts like the one presented here in, inter alia, *Preiser* and *Wolff, supra* and *Viens v. Daniels*, 871 F.2d 1328 (7th Cir.1989). *See also Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir.1995), *petition for cert. filed*, (May 16, 1996). We will now discuss these principles within the context of this case.

 When a state official violates the Constitution in his treatment of a state prisoner, his illegal conduct can, at least in theory, give rise to claims for monetary or declaratory relief under § 1983 and to claims for habeas corpus relief under § 2254. Although these statutes provide distinct avenues for relief, claims brought under § 1983 are not always independent of claims that have been brought or could be brought under § 2254.

Proving official misconduct for the purposes of § 1983 can often—but not always—involve the same factual issues that would be relevant in a potential claim under § 2254. This intersection between claims under §§ 1983 and 2254 can sometimes implicate the fundamental principles controlling federal jurisdiction generally, and habeas corpus jurisdiction in particular. According to these principles, the federal courts will not hear a state prisoner's § 2254 claims against a state official until the courts of that state have had the opportunity to identify and remedy any official misconduct. These principles of deference and reticence that guide the federal courts similarly prevent the district courts from considering any issues that *could be cognizable* in a § 2254 claim until the state prisoner has exhausted his state court remedies. If claims under statutes besides § 2254 could be used as instruments to decide issues that would be cognizable in a potential § 2254 action, the pursuit of such claims could promote the evasion of the exhaustion requirement for § 2254. Consequently, a prisoner cannot bring a § 1983 claim that involves issues cognizable in habeas corpus until he complies with the procedural prerequisites for relief under § 2254. A decision on a § 1983 claim brought in this posture would create situations in which a federal court would make an initial, and perhaps a preclusive, ruling on an issue that should first be addressed by state courts.

But this limitation applies only if the preclusive effect of a § 1983 judgment is certain. If resolution of the issue in federal court would not *necessarily* undermine the state court's ability to make an independent determination of issues cognizable in habeas corpus, then that issue is cognizable under § 1983, regardless of whether a state court has ruled on that issue. *Heck*, 512 U.S. at —— n. 7, 114 S.Ct. at 2372 n. 7; *Simpson*, 73 F.3d at 136; *Viens*, 871 F.2d at 1333–34.

These procedural requirements are relatively clear when stated abstractly; but they can be difficult to apply to the complicated factual situations that arise in many cases. This is such a case. Clayton–EL alleges the kind of official misconduct that is relevant to claims under §§ 1983 and 2254; he contends that Fisher's withholding of notice of his first disciplinary hearing violated his rights to procedural due process. The claims now before us that are based on this allegation seek only damages and declaratory relief. Clayton–EL's attack on the first disciplinary hearing does not include a request for an injunction ordering the restoration of good-time credits or the restoration of his grade. Nevertheless, a challenge to any aspect of the disciplinary process affecting Clayton–EL has the potential to implicate issues cognizable in habeas corpus proceedings. If, in the future, Clayton–EL were to seek restoration of his good-time credits, a judgment on some of his § 1983 claims could preclude the adjudication of certain factual issues. Careful scrutiny is required to determine which of his claims are cognizable strictly under § 1983 and which raise issues cognizable in habeas corpus.

This determination depends upon identifying the injuries involved in each of his claims. As the Supreme Court has recently indicated, the injury alleged in a claim—and not the relief sought in the claim—determines whether a claim implicates issues cognizable in habeas corpus. *See Heck*, 512 U.S. at —— ——, 114 S.Ct. at 2369–70; *see also Wolff*, 418 U.S. at 553–54, 94 S.Ct. at 2973–74. Clayton–EL seeks damages for all of his injuries, but this does not ensure that all of his claims will be confined within the boundaries established for claims under § 1983. To sustain his claims under § 1983, Clayton–EL must prove that he suffered particular injuries. If the proof of any of those injuries involves the proof of a fact that would also be essential to a habeas corpus action, then the claim that depends upon proof of that injury implicates habeas corpus.

Clayton-EL alleges that Fisher ultimately caused several different injuries, which fall into two categories. The first category includes the injuries for which Fisher's alleged conduct is the sole and immediate cause: the injury arising from the simple occurrence of a constitutional violation and Clayton–EL's mental and emotional pain and suffering from the deprivation of his constitutional rights to due process. If these injuries occurred, they would have been complete as

soon as Clayton–EL discovered that he had been deprived of notice. Their existence would not depend upon anything that happened at a disciplinary hearing. The second category includes injuries which were caused by his confinement in disciplinary segregation, and he alleges that Fisher's withholding of notice was the proximate cause of this confinement. He therefore seeks to hold Fisher legally responsible for his loss of access to the courts, his loss of prison wages, and his pain and suffering for having been in disciplinary segregation. Thus, Clayton–EL's two categories of injuries lead to two distinct categories of claims. For ease of reference, we will refer to claims relating to the first category of injuries (those not dependent upon anything that happened at the disciplinary hearing) as Category 1 claims, and we will refer to the claims relating to the second category of injuries (the confinement-related matters) as Category 2 claims.

The Category 1 claims are concerned with issues cognizable only in § 1983. Clayton–EL brings these claims without any regard to the outcome of the disciplinary process in his case. Deciding these claims does not require a federal court to decide whether the disciplinary process against Clayton–EL reached the correct result. Indeed, the claims would be viable even if either of his disciplinary hearings had not led to any sanctions at all. The Category 2 claims do, however, implicate habeas corpus. In order to prove that these injuries occurred, Clayton–EL must do more than prove that Fisher engaged in misconduct and that the misconduct injured him; he must also prove that he himself would not have been subject to any sanctions at all for the fistfight with LaSumba. If Clayton–EL proved in a § 1983 action that the result of the disciplinary process was invalid, this proof would have preclusive effect in a state court habeas corpus action that challenged the rescission of his good-time credits. Because the federal courts must let state courts have the first chance to determine all of the facts necessary to a habeas corpus claim, Clayton–EL could not bring a § 1983 claim that involved these facts until

he had gone to state court and presented all of the issues cognizable in habeas corpus.

The district court was sensitive to these procedural requirements, but, despite this sensitivity, it did not perfectly comply with them. It made several errors in its disposition of Clayton–EL's claims. Some of these errors involved the Category 1 claims, and the other errors related to the Category 2 claims. We will separately discuss the errors relating to each group of claims.

### A.

■ The district court made two errors in its treatment of the Category 1 claims. The first error was the decision to stay the litigation of these claims pending Clayton–EL's exhaustion of his state remedies. No stay was necessary for these claims because the district court could have decided them without necessarily affecting Clayton–EL's pursuit of state remedies. Although the decision to stay the litigation on these claims had no dispositive effect on them, it was error in the sense that it delayed the resolution of an important constitutional claim. We have previously held that this kind of delay is improper. *Viens*, 871 F.2d at 1333.

Once the litigation resumed, the district court made a more serious error with respect to the Category 1 claims. The district court concluded that the outcome of the second disciplinary hearing somehow invalidated these claims. This conclusion was error because, as we have noted, these claims did not depend upon finding any facts about the outcome of the disciplinary process. The essential factual question for all of these claims is whether Fisher withheld notice of the disciplinary hearing. If Clayton–EL can resolve this question in his favor, he can collect nominal damages.[3] *Carey*, 435 U.S. at 266, 98 S.Ct. at 1053–54. If he can also prove that the withholding itself—regardless of its consequences for disciplinary sanctions—caused him to suffer emotional and mental pain and suffering, he can collect compensatory damages. If he can prove that

---

**3.** In Clayton–EL's suit for a writ of mandamus, a state court did find that Fisher had failed to serve ClaytonEL with the disciplinary ticket. This finding might have collateral estoppel effect on federal adjudication of Clayton–EL's § 1983 suit, but we need not and do not decide that issue.

Fisher deliberately or wantonly withheld notice, he may collect punitive damages. The outcome of the disciplinary process sheds no light on any of these factual issues, and they can be adjudicated without regard to any questions about the sanctions imposed upon Clayton–EL. The district court should now resume the litigation of these claims.

### B.

▮ The district court properly began its treatment of the Category 2 claims. In 1988, at the outset of the litigation, it correctly ruled that their implications for habeas corpus created an obstacle to their adjudication under § 1983. If the court had then ruled on any of Clayton–EL's claims that related to the imposition of disciplinary sanctions at the first hearing, it would have implicitly ruled on the legality of the entire outcome of that hearing. The legality of the outcome of the first hearing was an issue cognizable in habeas corpus; it would have been an essential issue in any challenge to the rescission of Clayton–EL's good-time credits. Therefore, the court had to withhold its adjudication of this issue until Clayton–EL pursued a writ of habeas corpus or equivalent state relief with respect to the first hearing; and the district court did so, suspending the adjudication of the case pending Clayton–EL's state-court challenge to the first hearing. As we have just noted, this ruling was erroneous in part because it also delayed the adjudication of claims that could have been decided right away. Nevertheless, it was consistent with the procedural rules controlling this case to the extent that it forestalled the litigation of claims that implicated issues in habeas corpus.[4]

The district court's handling of these claims faltered, however, in 1990, when the parties sought to resume adjudication of the case. As we have just noted, it was then appropriate for the district court to decide the merits of the claims that did not relate to Clayton–EL's confinement in disciplinary segregation; such a decision would have been appropriate all along. But, at this point, the claims that related to Clayton–EL's confinement in disciplinary segregation still implicated habeas corpus issues. When the litigation began, these claims implicated issues that would be cognizable in a § 2254 challenge to the first disciplinary hearing; in 1990, they implicated issues that would be cognizable in a § 2254 challenge to the *second* disciplinary hearing. In order to decide these claims against Fisher, the district court would have had to make factual findings about the fairness of the second hearing. To determine whether Fisher had caused the

---

**4.** As an aside, we note that the district court's issuance of the stay order in 1988 may not have been perfectly correct. Our doubts about this ruling arise from the fact that there seems to be some uncertainty about the precise nature of the procedural rules that applied in 1988. Because the stay order is not at issue in this appeal, we need not resolve our doubts; but we do find it worthwhile to briefly discuss the nature of those doubts because such a discussion may illuminate problems that often seem obscure in prisoners' § 1983 suits.

There is no doubt that a prisoner may not maintain a § 1983 claim that implicates live issues cognizable in a potential habeas corpus claim. The Supreme Court clearly announced this principle in *Preiser* and *Wolff*. But the precise implications of this principle may not have been clear in 1988. At that time, some courts held that the exhaustion requirement applied to a § 1983 claim that implicated issues in habeas corpus. *See Heck*, 512 U.S. at ——, 114 S.Ct. at 2370 (discussing interpretations of *Preiser* and *Wolff*); *see also Crump*, 807 F.2d at 1399–1401; *Hanson*, 791 F.2d at 95–97. Given this understanding of the relationship between § 1983 and

§ 2254, a stay would be the proper treatment for a § 1983 claim that implicated issues cognizable in habeas corpus. The stay would be lifted when the prisoner complied with the exhaustion requirement.

Since 1988, however, the Supreme Court has held that this position was incorrect. In *Heck*, decided in 1994, the Court held that the exhaustion requirement never applies to § 1983 claims. Instead, a § 1983 claim that implicates issues in habeas corpus does not accrue until the prisoner obtains a writ of habeas corpus or similar relief. 512 U.S. at ——, 114 S.Ct. at 2372. Under this holding, dismissal and not a stay would be the proper disposition for a § 1983 claim that was brought prematurely. In making this holding, the Supreme Court suggested—but did not clearly assert-that this conception of such § 1983 claims had been the law ever since *Wolff*. As we have noted, the procedural posture of this case makes it unnecessary for us to decide what the law actually was before *Heck*. But courts in other cases may need to resolve this uncertainty when dealing with pre-*Heck* decisions to stay the litigation of a § 1983 claim that implicates issues cognizable in habeas corpus.

injuries that followed Clayton–EL's confinement in disciplinary segregation, the district court would have had to decide whether Clayton–EL would have been placed in disciplinary segregation regardless of Fisher's conduct. This latter finding involved making a finding about the fairness of the second hearing. But such a finding could have had preclusive effect in a state or federal proceeding in which Clayton–EL challenged the rescission of his good-time credits. In other words, in 1990, the district court faced the same obstacle to the adjudication of these claims that it had recognized in 1988. The district court recognized that it would have to make factual findings about the fairness of the second hearing in order to rule on the merits of Clayton–EL's claims. Indeed, it issued an order instructing the parties to present evidence and arguments about this factual issue. But it did not seem to recognize that this issue would be relevant in a potential habeas corpus proceeding, and it therefore failed to recognize that it could not consider the merits of any of Clayton–EL's claims that involved this issue. Clayton–EL and Fisher devote much of their appellate arguments to a debate about whether the district court correctly decided that the second hearing was fair. They also debate whether the issue of the fairness of the second hearing involved genuine disputes of material fact. These arguments are beside the point. The district court did not err because it made the wrong decision about the fairness of the second hearing or because it decided that issue too soon. It erred in concluding that the claims involving that issue were properly before it. Clayton–EL's claims that related to his confinement in disciplinary segregation are no more ready for adjudication now than they were in 1988 because they are not yet cognizable under § 1983. They should be dismissed.[5]

## III.

We now remand the case to correct these errors. The district court should resume its consideration of the claims against Fisher in his individual capacity that do not involve any issues concerning Clayton–EL's confinement in disciplinary segregation. It should dismiss all of the claims that depend upon findings about the legality of that confinement because such claims are not yet cognizable under § 1983. This is not to say that they never will be cognizable.[6] To make these claims accrue under § 1983, Clayton–EL must prove that his disciplinary sanctions have been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at ——, 114 S.Ct. at 2372.

For these reasons, the judgment of the district court is REVERSED, and the case is remanded for further proceedings not inconsistent with this opinion.

---

**5.** As we noted in footnote 4, there may be a question about whether stay or dismissal was the proper disposition for these claims before the Supreme Court decided *Heck*. In the light of that decision, however, there is no question that dismissal is the appropriate treatment now.

**6.** Given the time that has elapsed since the relevant events, we note that the defendants in a state-court challenge of the second disciplinary hearing might assert a statute-of-limitations defense. We presume that the doctrine of equitable tolling would overcome such a defense in state court. If Clayton–EL was able to resume his § 1983 claims related to the disciplinary sanctions, he would not, of course, immediately face any statute-of-limitation problems in federal court because his cause of action under § 1983 would not accrue until a state court (or federal court ruling under § 2254) undermined those sanctions. *Heck*, 512 U.S. at ——, 114 S.Ct. at 2372.