**Fares UMAR, Plaintiff,**

v.

**Adrienne JOHNSON, et al., Defendants.**

**No. 94 C 5699.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 9, 1997.

Thomas Peters, Chicago, IL, for Plaintiff.

Jonathan C. Green, Thomas Ciecko, Assistant Attorneys General, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Fares Umar ("Umar"), who was formerly in custody at Stateville Correctional Center ("Stateville"), brings this 42 U.S.C. Section 1983 ("Section 1983") action both individually and on behalf of a class of Stateville inmates (the "Inmate Class") against a group of present or former Stateville officials alleged either to be members of, or to have supervisory control over, the Stateville Adjustment Committee ("Adjustment Committee").[1] Umar's Amended Complaint ("AC") charges defendants (in both their personal and official capacities) with having violated the Fourteenth Amendment procedural due process rights of each member of the Inmate Class (including Umar) by denying the inmate the right to call witnesses during his disciplinary hearing or hearings before the Adjustment Committee.[2] Both equitable relief and damages are sought as remedies.

Umar now moves for summary judgment as to the claim brought on behalf of the Inmate Class. Defendants have in turn filed a cross-motion for summary judgment as to both Umar's individual claim and the Inmate Class claim. Defendants have also moved for decertification of the Inmate Class.

At this point the several motions are fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, (1) Umar's motion is denied, (2) defendants' motion to decertify the Inmate Class is denied, (3) defendants' motion for summary judgment as to Umar's individual claim is granted and (4) defendants' motion for summary judgment as to the Inmate Class claim is denied.

### Summary Judgment Standards

Under familiar Rule 56 analysis, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). This Court is called upon to draw inferences in the light most favorable to the non-moving party, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions for summary judgment are involved, these principles require the Court to take a dual perspective—one that this Court has frequently described as Janus-like. In this instance that problem does not turn out to create any difficulty, for no material fact is in dispute—instead the parties are at odds about whether as a matter of law defendants' policies applied to Umar, and continued to be applied to the Inmate Class, infringed their Fourteenth Amendment rights to due process.

### Background

In April 1993 Umar was a Stateville inmate sharing cell # B–E 807 with Pablo Malave ("Malave") (U.12(M) ¶ 1).[3] On April 18

1. Defendants comprise Adrienne Johnson ("Johnson"), Melvin Allen ("Allen"), Salvador Godinez ("Godinez"), William Barham ("Barham") and Phillip Roos ("Roos").

2. Although AC Count III states an additional due process claim under the state constitution (Ill. Const. art. I, § 2), Umar has not relied upon (or even referred to) that provision in either his motion for summary judgment or his supporting papers. Because Umar has not suggested that section confers broader procedural due process protections than the Fourteenth Amendment, this opinion speaks only of the latter.

3. This District Court has designed General Rule ("GR") to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. In a cross-motion situation such as this one, each side ordinarily submits both an initial GR 12(M) and a GR 12(N) statement. But due to a delay in defendants'

officers removed Umar and Malave from their cell for a "shakedown" search of the cell (D.12(N) Supp. ¶ 5). In the course of that search one officer discovered four homemade knives within socks hanging above the beds (*id.;* Exs. 1, 2).

Disciplinary reports were then issued to Umar and Malave, charging each with a violation of Illinois Department of Corrections Regulation 504–104 (Dangerous Contraband) ("Reg.504–104"). Officer McCoy ("McCoy") reported in Malave's disciplinary report that "Inmate Malave stated that all of the knifes [sic] found were his" (D.Ex. 1). Umar's disciplinary report—also completed by McCoy—did not identify the owner of the knives (D.Ex. 2). Malave was taken from his cell and placed in temporary confinement later that same day (D.12(N) ¶ 11).

On April 22 the Adjustment Committee held a disciplinary hearing in connection with Malave's charged violation of Reg. 504–104 (D.12(N) Supp. ¶ 7). At that hearing Malave did not again acknowledge ownership of the knives. Rather the Adjustment Committee Summary reports Malave as having stated "I lived in cell # 807 B–East on 4–18–93, and I have nothing else to say" (D.Ex. 3). At the end of the Summary the Adjustment Committee found Malave guilty and imposed upon him, along with other disciplinary actions, the loss of one year of good time credits (D.12(N) Supp. ¶ 8; D. Ex. 3). Among the stated reasons in support of that disposition was the Adjustment Committee's finding that "[Malave] did not deny the charge or offer a defense in his own behalf" (D.Ex. 3).

Umar received notice of his Adjustment Committee hearing on April 20 (D.12(N) Supp. ¶ 9). That notice included a description of the procedure for a Stateville inmate to request witness testimony for the hearing (D.Ex. 2):

You may ask that witnesses be interviewed and, if necessary, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee.

Each inmate has these four ways to deliver the witness request form to the Adjustment Committee (D.12(N) Supp. ¶ 21):

1. by completing the tear-off sheet at the bottom of the disciplinary ticket at the time he signs for the ticket, in which case the request appears on the copy of the ticket received by the Adjustment Committee;

2. by placing the tear-off sheet (or any written request) in a deposit box located in the inmate's housing unit, in which case the request is then delivered to the Adjustment Committee;

3. by sending a written request via institutional mail to the Adjustment Committee; or

4. by handing a written request to a correctional officer or the inmate's counselor for delivery to the Adjustment Committee.

Although the inmate can also make an oral request for witnesses when he appears before the Adjustment Committee, the Adjustment Committee reserves the right to disapprove requests not made before the hearing (D.12(N) Supp. ¶ 23; Johnson Aff. ¶ 9).

Significantly, a properly completed witness request form by a Stateville inmate facing discipline does not assure that those witnesses will actually appear before the Adjustment Committee. Instead Title 20 of the

---

original filing, they tendered only a GR 12(N) statement. Umar then failed to file a reply to defendants' GR 12(N)(3)(b) statement of additional facts. Hence all statements made in defendants' GR 12(N)(3)(b) document will be deemed "true and admitted" to the extent that those statements are supported by the record (*Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th

Cir.1993)). Umar's statements will be cited "U. 12(M) ¶ —." Defendants' responses and statements of additional facts are respectively cited "D. 12(N) ¶ —" and "D. 12(N) Supp. ¶ —." Those same "U." and "D." shorthand designations will also be used for the parties' other submissions.

Illinois Administrative Code ("Code" [4]) creates a system in which a Hearing Investigator may be asked to interview all requested witnesses and then to provide a summary of witness testimony to the Adjustment Committee. In that regard Code § 504.80(h) provides:

The Adjustment Committee may consider any statements of witnesses with relevant knowledge of the incident.

(1) The Committee or its Hearing Investigator may interview witnesses and prepare or review summaries of their testimony prior to or at the hearing.

(2) The committed person does not have the right to confront or cross-examine any witness but may submit questions for witnesses to the Committee prior to the hearing. These questions shall be asked by the Committee or its Hearing Investigator unless found to be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

(3) A means shall be provided in each living unit for committed persons to submit witness request slips. The Committee may disapprove witness requests that are not received prior to the hearing.

(4) Witnesses requested by committed persons may be excluded if their testimony would be, among other matters, irrelevant or cumulative or would jeopardize the safety or disrupt the security of the facility. If any witness is excluded, a written reason shall be provided.

In practice the Adjustment Committee nearly always delegates the responsibility of interviewing requested witnesses to a Hearing Investigator. Here is the affidavit from Johnson, the Adjustment Committee Chairperson both now and at the time of Umar's hearing (Johnson Aff. ¶ 11):

When either the inmate or the Adjustment Committee requests the testimony of a relevant witness, the request is given to the Adjustment Committee Investigation Officer who personally interviews the witness and writes a report of that contact. The report is given to the Adjustment Committee.

Johnson Aff. ¶ 12 asserts the existence of an exception to that general rule where "the committee is convening and a witness who has not already been contacted is readily available." But only one situation identified in the record fits that description: where an inmate witness is "readily available" to the Adjustment Committee because he himself is being heard personally at the same time on a disciplinary matter of his own (*id.*). Johnson estimated that a witness is thus "readily available" to the Adjustment Committee only 1% to 5% of the time (Johnson Dep. 13).

On April 26, four days after Malave's Adjustment Committee hearing, Umar appeared before the Adjustment Committee on his charge of violating Reg. 504–104. There is a dispute as to whether Umar requested a witness before the hearing: Umar claims that he requested Malave as a witness by filling out the request form at the bottom of his disciplinary report and placing that slip in the appropriate box located in B–East Cell House (D.12(N) Supp. ¶ 11), while defendants contend that Umar failed to make any request before his hearing (D.12(N) Supp. ¶¶ 10, 12). Umar further claims to have requested Lieutenant Hughes ("Hughes")—a Stateville officer who allegedly would have testified to Malave's responsibility for the knives—as a witness during the April 26 hearing (D.12(N) Supp. ¶ 13). Defendants contend that anything Umar said about Hughes did not rise to the level of a formal request for a continuance to call him as a witness (D.12(N) Supp. ¶ 16). There is no reference in the Adjustment Committee Summary of Umar's April 26 hearing to a request for Hughes' testimony (D.Ex. 4).

After hearing from Umar the Adjustment Committee found that he had violated Reg. 504–104 and imposed upon him, along with other disciplinary actions, the same loss of one year of good time credits that had been imposed on Malave (D.Ex. 4). In reaching

---

**4.** Code citations will omit any reference to Title 20, citing only the section number within that title.

that conclusion the Adjustment Committee clearly considered Malave's statement during his hearing four days earlier, for Umar's Adjustment Committee Summary states that "Inmate's cell-mate Malave N74257 did not claim ownership" of the knives "as reported" (D.Ex. 4). Applying the "constructive possession" rule of Code § 504.20(e), the Adjustment Committee ultimately found that the presumption arising from Umar's assignment to and presence in the cell at the time the knives were found was not sufficiently rebutted to free Umar from guilt (D.12(N) Supp. ¶ 18). Godinez, then Stateville Warden, approved the Adjustment Committee's action through a designee on April 28 (D. Ex. 4; Godinez Aff. ¶ 5).

Umar filed a timely grievance of the Adjustment Committee's decision on May 12. Grievance Hearing Officer Allen denied that grievance on June 2 "after a total review of all available information" (U.Ex. 10). Godinez then concurred in that denial through a designee on June 9 (U. Ex. 10; Godinez Aff. ¶ 5). Next Umar filed a request for further review by the Illinois Department of Corrections Administrative Review Board ("Review Board") (U.Ex. 8). After "a total review of all available information and a compliance check with the procedural due process safeguards outlined in Departmental Rule 504," the Review Board—consisting of panel members Barham and Roos—denied Umar's grievance (U.Ex. 10).

Umar was released on parole on October 13, 1995 (D.12(N) Supp. ¶ 25). That date had of course been delayed by the loss of his good time credit.

### Procedural History

Umar filed an individual Section 1983 action seeking damages and injunctive relief on

September 19, 1994. After having counsel appointed, Umar filed an Amended Complaint on May 1, 1995 seeking both damages for himself and declaratory and injunctive relief on behalf of a proposed class. On August 7, 1995 this Court certified a class for declaratory and injunctive relief as to AC Count IV, and on August 25, 1995 it refined that class definition. This opinion further refines the class somewhat to embrace:

> All inmates at Stateville Correctional Center (a) who have had, as of May 1, 1993, or who hereafter during the pendency of this action will have, pending disciplinary hearings; (b) who have requested or hereafter request the presence of witnesses at such hearings; (c) whose requests in that respect have been or are hereafter denied as a result of defendants' practice of such denial; and (d) who had or will have at stake in those hearings the potential loss of good time credits.[5]

After the close of discovery, the current cross-motions followed.

### Viability of Any Section 1983 Claim

Defendants argue that both Umar's individual damages action and the claim of the Inmate Class for declaratory and injunctive relief are barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In addressing the right of an inmate to bring a Section 1983 damage action to recover for his or her allegedly unlawful imprisonment or conviction, *Heck, id.* at 486–87, 114 S.Ct. at 2372–73 (emphasis in original and footnote omitted) said:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983

---

**5.** What has just been set out in the text differs as to element (d) from defendants' version found at D. 12(N) Supp. ¶ 24. Defendants would instead limit the class to those *"who have lost* good time credits as a result" of Adjustment Committee hearings. But *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978), quoting *Fuentes v. Shevin,* 407 U.S. 67, 87, 92 S.Ct. 1983, 1997–98, 32 L.Ed.2d 556 (1972) (alteration in original), teaches:

> It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a

significant property interest is at stake, whatever the ultimate outcome of the hearing.... Because Stateville inmates who risk losing good time credits at Adjustment Committee hearings have a constitutionally-protected liberty interest at stake (*Sandin v. Conner,* 515 U.S. 472, 477–79, 483–84, 115 S.Ct. 2293, 2297, 2300, 132 L.Ed.2d 418 (1995)), they are appropriate members of the plaintiff class seeking to assert their due process rights.

plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

And ever since *Miller v. Indiana Dep't of Corrections,* 75 F.3d 330, 331 (7th Cir.1996) it has been the law of this Circuit that the *Heck* rule applies to an inmate's challenge to confinement imposed by an administrative ruling in the state prison system. Now *Edwards v. Balisok,* —— U.S. ——, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) has definitively confirmed the propriety of that application.

Umar does not claim to have sought relief from his Adjustment Committee sentence either in a Section 2254 action or by pursuing any of the possible state remedies adverted to in *Heck.* Hence a Section 1983 damages action by Umar that involved a direct attack on the legality of the Adjustment Committee's April 26, 1993 ruling revoking his good time credits would plainly be barred by *Heck* and *Edwards.* But the issue at hand is whether Umar's more narrow due process challenge to the *procedures* invoked by the Adjustment Committee for interviewing witnesses is itself barred by that line of cases. As U.R. Mem. 29–30 states:

> [Umar's] claim is limited to those damages inherent in the alleged procedural violations and does not include the damages caused by the decision to revoke his good time credits.... Any claim for damages for the resulting loss in good time credits must await .... a ruling overturning the Adjustment Committee's decision to revoke [Umar's] good time credits.

On that score Umar claims to state precisely the type of procedural due process claim authorized by *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which was expressly ratified in *Heck* itself (512 U.S. at 482–83, 114 S.Ct. at 2369–71).

As *Edwards,* —— U.S. ——, at —— – ——, 117 S.Ct. 1584, at 1587–88, 137 L.Ed.2d 906

has most recently reaffirmed, the test for whether Umar's Section 1983 damage claim is barred is whether, if successful, Umar's challenge would "necessarily imply the invalidity of the deprivation of his good-time credits" (*id.* at ——, 117 S.Ct. at 1588; see also *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372–73). And *Heck,* 512 U.S. at 487 n. 7, 114 S.Ct. at 2373 n. 7 (emphasis in original and citations omitted) has provided this illustration:

> For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful.

In parsing those decisions this Court finds that a successful prosecution of Umar's procedural due process claim would not *"necessarily* imply the invalidity of the deprivation of his good-time credits" (the *Edwards* test), so that Umar's claim is cognizable as a Section 1983 damages action. Although a finding that Umar's right to procedural due process had been denied by the Adjustment Committee would alone (even without proof of actual injury) entitle him to nominal damages (*Carey,* 435 U.S. at 266, 98 S.Ct. at 1053–54), that finding would not necessarily require that Umar's good time credits be reinstated. Rather the procedural error might very well have been harmless to the outcome of Umar's Adjustment Committee hearing (*Carey, id.* at 260, 98 S.Ct. at 1050–51).

Indeed, a state court could well decide that Umar would have been convicted on the basis of the "constructive possession" rule even had Malave and Hughes appeared personally before the Adjustment Committee on the day of that hearing (thus correcting the complained-of procedural flaws). Thus just as the doctrines of independent source and inevitable discovery dictate that the challenge to an illegal search or arrest will not necessarily imply the unlawfulness of a resulting convic-

tion (*Heck*, 512 U.S. at 487 n. 7, 114 S.Ct. at 2373 n. 7; *Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir.1995), cert. denied, — U.S. ——, 117 S.Ct. 104, 136 L.Ed.2d 58 (1996)), so too does the potential application of the doctrine of harmless error mean that Umar's vindication of his right to procedural due process before the Adjustment Committee will not necessary demonstrate the unlawfulness of his ultimate administrative sentence (*Heck*, 512 U.S. at 487 n. 7, 114 S.Ct. at 2373 n. 7).

In reaching that determination, this Court is of course well aware of the tension that emerges from recent decisions from our Court of Appeals on precisely what type of procedural due process attacks upon prison administrative proceedings are permissible under *Heck* as properly extended by *Miller* (and as now reconfirmed by the Supreme Court in *Edwards*). Although all of those decisions (*Evans v. McBride*, 94 F.3d 1062 (7th Cir.1996), cert. denied, — U.S. ——, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997), *Clayton–EL v. Fisher*, 96 F.3d 236, 241–42 (7th Cir.1996) and *Dixon v. Chrans*, 101 F.3d 1228 (7th Cir.1996)) necessarily work from the foundation established in *Heck*, they are difficult to reconcile in those terms.

But because *Edwards* postdates the most recent of those decisions, it is entirely appropriate—indeed this Court is obligated—to examine those earlier cases through the *Edwards* lens. And so viewed, it is *Clayton–EL* that most nearly parallels the Supreme Court's most recent teaching.

In *Clayton–EL* the plaintiff-inmate brought a Section 1983 damages action to challenge the procedures by which the prison disciplinary board had imposed upon him the loss of one year of good time credit for a prison fight. Specifically he disputed the outcome of a proceeding of which he had allegedly received no actual notice. In permitting portions of Clayton–EL's claims to proceed under Section 1983, the Court of Appeals divided his injuries resulting from alleged due process infirmities into two categories. "Category 1" includes injuries for which the unconstitutional conduct (the deprivation of procedural due process) (96 F.3d at 242–43):

is the sole and immediate cause: the injury arising from the simple occurrence of a constitutional violation and Clayton–EL's mental and emotional pain and suffering from the deprivation of his constitutional rights to due process.... Their existence would not depend upon anything that happened at a disciplinary hearing.

"Category 2," on the other hand (*id.* at 243):

includes injuries which were caused by his confinement in disciplinary segregation, and he alleges that [the due process violation] was the proximate cause of this confinement.

*Clayton–EL* concluded that Category 1 claims are actionable under Section 1983, while Category 2 claims "implicate habeas corpus" and should be dismissed (*id.*).

In that light Umar's claim would plainly be actionable under Section 1983. For just as was the case with Clayton–EL's "Category 1" claims, Umar has framed his due process claim "without any regard to the outcome of the disciplinary process in his case" (*id.*). Further, just as in *Clayton–EL*, resolving Umar's claim "does not require a federal court to decide whether the disciplinary process against [Umar] reached the correct result" (*id.*). Instead Umar's claim would be viable even if his Adjustment Committee hearing "had not led to any sanctions at all" (*id.*).

It is true that *Dixon (post-Clayton-EL and pre-Edwards)*, although nominally speaking in the same two-category framework as *Clayton–EL*, limited "category 1" to the issue of whether *Clayton–EL* received actual notice. Instead of employing the "confinement-related" line drawn in *Clayton–EL* 96 F.3d at 243, *Dixon*, 101 F.3d at 1230 spoke of relegating "[a]ll other claims"—with specific reference to "traditional due process claims," including inadequate notice—into "category 2." Even though the opinion refrained from "delineat[ing] the precise nature of Dixon's complaints," it explained (*id.* at 1231):

To decide that [Dixon] is entitled to damages would be to determine that his due process rights were violated in the matter in which the disciplinary proceedings were

conducted, and that determination, in turn, would call into question the results of the hearing.

That, however, is at odds with the *Edwards* reaffirmation of the distinction made in *Heck* (which it will be recalled had expressly reaffirmed the *Wolff* decision that the deprivation of fundamental procedural rights in the prison disciplinary context was independently actionable under Section 1983— see 512 U.S. at 482–83, 114 S.Ct. at 2369–71). For one thing, a prison disciplinary board's failure to give *any* notice—for which *Dixon* (like *Clayton–EL*) expressly permits a Section 1983 action due to that infirmity's "category 1" status—would surely be more likely to call into question the validity of that board's decision than would the board's provision of only *inadequate* notice. Yet under *Dixon* the former claim is allowed and only the latter claim is barred. Moreover, it does not necessarily follow that a procedural due process error necessarily calls into question the validity of a prison disciplinary board's judgment. That has been well demonstrated by the earlier-quoted language from *Heck* that emphasizes the availability of harmless error analysis to sustain discipline despite procedural errors. It must again be remembered that under *Heck* a Section 1983 damage claim is barred only if it would *necessarily* undermine the validity of a state judgment (or, under *Edwards*, the validity of a state disciplinary proceeding)—and this opinion has already explained why that does not hold true in Umar's situation.

As for the *pre-Clayton-EL* and *pre-Edwards* decision in *Evans*, it did express reservations about permitting a Section 1983 action solely for damages resulting from procedural errors in a prison disciplinary hearing. But *Evans*, 94 F.3d at 1063 still recognized that such a possibility could exist in an appropriate case (though it characterized that prospect, despite its having been expressly confirmed in *Wolff* and reconfirmed in *Heck*, as "odd").

Here Umar has complied with the *Wolff*-based proviso ("provided the prisoner avoids attacking the deprivation of good time credits") that was spoken of as a ground of distinction in *Evans*. Unlike the prisoner in *Evans*, Umar has expressly limited his Section 1983 damages claim to damages inherent in the alleged due process violations committed by the Adjustment Committee—he has advanced no claim for damages from the loss of good time credits. This Court is of course duty bound to comply with the Supreme Court's teaching, particularly when that Court does not appear to have perceived it as "odd" when it reconfirmed the *Wolff* holding in *Heck*.

In sum, this Court finds in light of *Heck* and *Edwards* that Umar's damages action for procedural due process errors in the Adjustment Committee hearing is cognizable under Section 1983. Both of those decisions carry forward the *Wolff* recognition that due process deprivations that do not necessarily connote the invalidity of the prison's disciplinary outcome are independently actionable. That resolution of potentially competing considerations may not weave a seamless web, but this Court's task is to apply the principles so recently reconfirmed by the Supreme Court, not to inquire into the wisdom of the policies underlying those principles.

*Section 1983   Claim of the Inmate Class*

■ Before turning to defendants' other attacks on the claim of the Inmate Class for injunctive and declaratory relief, this opinion can swiftly dispatch their contention that *Heck* bars any such claim. That precise argument was expressly rejected in *Edwards*. There an inmate had similarly requested prospective injunctive relief regarding a prison disciplinary procedure, and the Court said (—— U.S. ——, at —— – ——, 117 S.Ct. 1584, at 1588–89, 137 L.Ed.2d 906):

> Ordinarily, a prayer for such prospective relief will not "necessarily imply" the invalidity of a previous loss of good-time credits, and so may properly be brought under § 1983.

Defendants have suggested no reason why that rule ought not to govern here. This Court therefore holds that the Inmate Class' claim for prospective injunctive (and related declaratory) relief is also cognizable under Section 1983.

■ But that aside, defendants also take issue with the scope of that claim as now characterized by the Inmate Class. Defendants suggest that the nature of the claim as presented on the current motion for summary judgment has been impermissibly altered from the AC's framing of that claim, assertedly justifying dismissal.

It is true that the Inmate Class did amend its claim upon completing discovery. AC ¶¶ 44–45 had stated the claim in these terms:

44. The Defendants have established a policy which a) denies every Stateville inmate the opportunity to call relevant inmate witnesses at disciplinary hearings and b) on the surface directs inmates to file written requests for witnesses in advance of disciplinary hearings but in reality there is no procedure for collecting the written requests.

45. As a result of this policy, a) inmate requests to call other inmates as witnesses are always denied and b) the Defendants, acting in their official capacities can randomly deny inmate requests to call non-inmate witnesses at disciplinary hearings by disingenuously claiming that the charged inmate failed to submit a written request in advance of the hearing.

Now the Inmate Class' Motion for Summary Judgment ¶¶ 10–12 (citation omitted) reads:

10. It is the current policy of the Adjustment Committee at the Stateville Correctional Center to limit inmates to *ex parte* interviews of relevant witnesses.

11. This policy, which has been in effect for approximately two and one-half years, prohibits in-person, witness testimony at Adjustment Committee hearings.

12. Instead of hearing directly from the witnesses (other than the charged party), the Committee conducts *ex parte*

interviews of the witnesses by an unsworn investigator.

■ To be sure, a number of cases such as *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) teach that "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." But that caselaw is entirely beside the mark where (as here) the facts have been fully developed through discovery and a party is then really engaged in nothing more than the essential equivalent of amending the pleadings to conform to the evidence (something that is permitted even post-judgment, see Rule 15(b)). As observed in such cases as *Toth v. USX Corp.,* 883 F.2d 1297, 1298 (7th Cir.1989):

As we have noted many times, the complaint merely serves to put the defendant on notice and is to be freely amended or constructively amended as the case develops, as long as amendments do not unfairly surprise or prejudice the defendant.

Indeed, nothing in federal procedure compels a plaintiff to amend the complaint as discovery unfolds (*Ash v. Wallenmeyer,* 879 F.2d 272, 274 (7th Cir.1989)):

The federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process. The information is to be reflected in the framing of issues in the pretrial order, which supersedes the complaint.[6]

In short, the recasting of the Inmate Class' claim is an eminently reasonable adjustment necessary to state that claim properly, in light of the evidence uncovered during discovery, for purposes of these potentially dispositive motions. Defendants have identified no resulting prejudice from that change. Defendants' argument to dismiss the class claim on that basis is therefore rejected, and plaintiffs are granted leave under Rule 15(b)

---

6. [Footnote by this Court] Nor is it relevant that (as was true in *Ash*) there has been no such pretrial order entered in this case. As this Court has said on many occasions, summary judgment is the functional equivalent of a trial in situations where material facts are not in dispute. And of course where the parties advise that a case will travel the summary judgment route (either on one party's motion or on cross-motions) rather than moving toward a trial in the first instance, this Court never burdens the litigants with the duplicative preparation of a final pretrial order as well. There is no reason, then, that the Inmate Class should not be permitted to reshape their claim to conform to the proof in the present context.

to amend the AC to conform to their Motion ¶¶ 10–12 as a current statement of the Inmate Class' claim.

■ That however creates a new procedural problem for this class action. As defendants have pointed out, narrowing the Inmate Class' due process objection to the Adjustment Committee's practice of "calling" witnesses through ex parte interviews by an unsworn hearing investigator creates a situation in which Umar's claim is no longer typical of the Inmate Class.

That requires a bit of elaboration. Under Umar's own version of the events, he called just one witness (Malave) before his own Adjustment Committee hearing—and Malave had met personally with the Adjustment Committee about the selfsame incident just four days before Umar's hearing. That being the case, Umar cannot complain of any asserted due process deficiencies involved in the use of hearing investigator interviews rather than in-person testimony—for no hearing investigator was involved in his case at all. Hence Umar's own Fourteenth Amendment claim, which is based on the Adjustment Committee's refusal to call Hughes and Malave in Umar's own hearing, is no longer typical of the claim set out by the Inmate Class. And as stated in *Davis v. Ball Mem'l Hosp. Ass'n. Inc.*, 753 F.2d 1410, 1417 (7th Cir.1985), quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2369–70, 72 L.Ed.2d 740 (1982), that lack of typicality now makes Umar an improper class representative:

> The Supreme Court has repeatedly held that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."

■ That leads defendants to argue that the Inmate Class should be decertified. But such cases as *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397–401, 100 S.Ct. 1202, 1209–11, 63 L.Ed.2d 479 (1980) and *Sosna v. Iowa*, 419 U.S. 393, 399–403, 95 S.Ct. 553, 557–59, 42 L.Ed.2d 532 (1975) teach that once a class has been certified it acquires an existence separate and apart from that of the individual named plaintiff, so that the failure of his or her individual claim

does not impair the class' entitlement to relief. Hence Umar's inability to serve as an appropriate representative after certification of the Inmate Class does not require class decertification. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir.1982), quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977) (alteration in original), has so held:

> ■ Although a district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met, it need not decertify whenever it later appears that the named plaintiffs were not class members or were otherwise inappropriate class representatives. Rather, the Supreme Court has stated, "provided the initial certification was proper ... the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims."

In the present circumstance the appropriate procedure is to substitute a new named plaintiff, not to decertify the class (*Johnson v. Midland Career Inst., Inc.*, No. 93 C 1363, 1996 WL 54187, at *4 (N.D.Ill. Feb. 8); 13A Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3533.9, at 420–21 (2d ed.1984)). Where the class relief at issue is injunctive and declaratory in nature, it would be wasteful and contrary to the interests of justice to require a new class (and perhaps new class counsel) to start again at ground zero. Decisions such as *Forbes v. Trigg*, 976 F.2d 308, 315–20 (7th Cir.1992), *Ramer v. Kerby*, 936 F.2d 1102, 1104–05 (10th Cir. 1991) and *King v. Wells*, 760 F.2d 89, 92–93 (6th Cir.1985) suggest that the Inmate Class' Section 1983 claim is sufficiently colorable to justify the effort entailed in locating and designating a new class representative. Class counsel is authorized to take appropriate action to that end.

Because of the current procedural infirmity in that respect, the cross-motions for summary judgment as they pertain to the declaratory and injunctive relief claims of the

Inmate Class are not now ripe for decision. They are denied, without prejudice to their reassertion at an appropriate future time.

### Umar's Section 1983 Claim

■ As just outlined, Umar's Section 1983 claim differs from the due-process-based challenge of the Inmate Class. Umar's own Adjustment Committee hearing did not implicate the Hearing Investigator situation at all, but rather these two asserted due process violations:

1. Umar claims to have requested at the time of his Adjustment Committee hearing that Hughes be a witness (D.12(N) ¶ 13). But Hughes was neither called personally nor interviewed.

2. Umar also claims to have requested Malave as a witness in advance of the hearing by filling out the request form at the bottom of Umar's disciplinary report and placing that form in the appropriate box in B–East Cell House (D.12(N) Supp. ¶ 11). But Malave was interviewed personally by the Adjustment Committee only in the context of Malave's own disciplinary hearing on identical charges.

*Black v. Lane,* 22 F.3d 1395, 1402 n. 9 (7th Cir.1994), citing *Wolff,* 418 U.S. at 563–67, 94 S.Ct. at 2978–80, set out the steps of procedural due process required in Adjustment Committee hearings at which an inmate's good-time credits are at stake:

As this court has noted, prison disciplinary hearings must meet the following requirements to satisfy the Due Process Clause:

1. Written notice of the charge against the prisoner, given at least twenty-four hours prior to the hearing.

2. The right to appear in person before an impartial hearing body.

3. The right to call witnesses and to present documentary evidence, when to do so will not unduly jeopardize institutional safety or correctional goals.

4. A written statement of reasons for the disciplinary action taken.

Clearly Umar's claims relate only to the third of those required steps: the opportunity to call witnesses.

■ As for the Adjustment Committee's failure to call or to interview Hughes, Umar's claim is without constitutional merit. Umar admitted at his Dep. 35–36 that he did not designate Hughes as a witness until Umar appeared before the Adjustment Committee on the hearing date of April 26, 1993. *Hamilton v. O'Leary,* 976 F.2d 341, 346–47 (7th Cir.1992) holds that a prison disciplinary board may quite properly deny untimely witness requests without running afoul of *Wolff.* Indeed, the propriety of rejecting such day-of-hearing witness requests has just been reconfirmed in *Sweeney v. Parke,* 113 F.3d 716, 720 (7th Cir.1997):

An inmate's day-of-hearing request to call witnesses may be a delay tactic (especially if the request to call witnesses is accompanied by a request for a continuance); it may raise the level of confrontation between the prison staff and the inmate and thereby undermine prison officials' authority; and it may disrupt the institution's disciplinary process and hinder its rehabilitative function. These risks are inherent in day-of-hearing requests, and prison officials are justified in summarily denying such requests.

As for Umar's request that the Adjustment Committee call Malave, the parties dispute the timeliness of that request (D.12(N) Supp. ¶¶ 11–12). But there is no question that the Adjustment Committee heard from Malave directly about the incident in question (at Malave's own Adjustment Committee hearing) just four days before Umar's hearing. Nor is there any doubt that the Adjustment Committee weighed that testimony when reaching a determination on Umar's case. That is shown by the Adjustment Committee Summary from Umar's April 26, 1993 hearing, which found that Malave "did not claim ownership" of the knives "as reported" (presumably in McCoy's report) (D.Ex. 4).[7]

---

7. It should be emphasized that this Court's role is *not* to evaluate the substantive persuasiveness of that finding that Malave's refusal to make a

statement at his hearing amounted to his "not claim[ing] ownership" of the contraband, thus somehow undercutting his earlier admission of

To begin with, Umar had no Fourteenth Amendment right to be present in person when Malave was interviewed by the Adjustment Committee (*Francis v. Coughlin*, 891 F.2d 43, 48 (2d Cir.1989); *Ra Chaka v. Givens*, No. 90 C 130, 1993 WL 96259, at *3 (N.D.Ill. Mar. 31)). Instead Umar's Section 1983 claim must establish that the Adjustment Committee's consideration of Malave's earlier testimony at his own disciplinary hearing violated Umar's constitutional right to witness testimony. And in that respect *Sweeney*, 113 F.3d 716, 720 n. 4 has recently reemphasized the limitations on the *Wolff* mandate:

> The Court dedicated more than a page of its opinion in *Wolff* to discussing the qualified nature of inmates' right to call witnesses during disciplinary proceedings. *See Wolff*, 418 U.S. at 566–67 [94 S.Ct. at 2979–80]. The following examples are illustrative: "Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Id.* at 566 [94 S.Ct. at 2979]. "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* "Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments." *Id.* at 566–67, 94 S.Ct. at 2980.

*Wolff, id.* at 566, 94 S.Ct. at 2979–80 specifically held that prison officials are entitled to substantial discretion in deciding when to exclude (for example) irrelevant or unnecessary witnesses.

In light of that emphasis on the discretion accorded to prison officials as to the calling of witnesses, it must be held that the Adjustment Committee did not violate Umar's right to procedural due process when it failed to *recall* Malave as a witness. Here is the uncontroverted record evidence as to the conditions under which the Adjustment Committee must conduct its hearings:

1. Stateville is a maximum security facility currently housing 2330 male prisoners, approximately 65–70% of whom are serving sentences for Class X felonies or murder (DeTella Aff. ¶ 3).

2. Stateville has nine housing units plus a hospital, facilities that are spread out over 64 acres. Inmate movement is strictly regulated, with most requiring staff escort (*id.* ¶ 5).

3. Johnson personally chairs approximately 50 Adjustment Committee hearings per day, 5 days per week (Johnson Aff. ¶ 5).

Under those circumstances Johnson has shown that even had Umar made a timely request to call Malave as a witness, the Adjustment Committee "would not have felt obligated to recontact the witness" (Johnson Aff. ¶ 17). That decision cannot be labeled as an abuse of the discretion conferred upon the Adjustment Committee by *Wolff*, so it is not a violation of Umar's "qualified" Fourteenth Amendment right to call witnesses.

As n. 7 has already said, the dubious nature of the Adjustment Committee's evaluation of the evidence does not rise (or fall) to the level of a due process violation. And to the extent that it may cast doubt on the decision on the merits, that is precisely the inquiry foreclosed to this Court by *Heck* and *Edwards* in favor of a proper challenge before an Illinois state court. Those Supreme

such ownership. As implausible (or even foolish) as that evaluation may be—and it certainly fits both of those descriptions—this Court sits only to judge whether the action of the Adjustment Committee deprived Umar of due process, not to act as a super-administrative reviewer on the merits.

Court decisions permit examination in this Section 1983 damages action only of the *procedure* used to discipline Umar, and this Court has already rejected that line of constitutional attack. In sum, Umar's Section 1983 action is dismissed.[8]

### Conclusion

Because there is no genuine issue of material fact in that regard, defendants are entitled to a judgment as a matter of law as to Umar's Section 1983 claim for damages. Accordingly Johnson, Allen, Godinez, Barham and Roos are dismissed as defendants to the extent that recovery had been sought against each in his or her personal capacity.

Next, defendants' motion to decertify the Inmate Class is denied. Instead class counsel is ordered to take such action as may be appropriate to identify and move for the prompt appointment from among the existing Inmate Class of a new class representative. Relatedly, the parties' cross-motions for summary judgment as to the Inmate Class' Section 1983 claim for declaratory and injunctive relief are both denied, without prejudice to their reassertion at a future appropriate time.

Finally, this action is set for a status hearing at 9 a.m. June 20, 1997. At that time the parties' counsel should be prepared to discuss proceedings looking to the expeditious disposition of the remaining issues.

---

8. That dismissal obviates the need for this Court to address defendants' arguments asserting the qualified immunity or lack of personal involvement of Godinez, Allen, Barham and Roos in Umar's case.